Filed 10/17/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JUAN NUNO,<br><br>    Defendant and Appellant. | H051205<br>(Monterey County<br>Super. Ct. No. SS101423A) |

In this appeal we examine whether, in advance of an evidentiary hearing under Penal Code section 1172.6,[1] the petitioner may obtain discovery of material, exculpatory evidence in peace officer personnel records under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) through a motion pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*) and related statutes.

The prosecution of defendant Juan Nuno began in 2010. One year later, following a preliminary hearing, Nuno pleaded no contest to attempted murder (§§ 664, 187) and admitted several sentence-related allegations. In accordance with a plea agreement, the trial court sentenced Nuno to 30 years in prison.

In 2022, Nuno filed a petition to vacate his attempted murder conviction and be resentenced under former section 1170.95 (now section 1172.6) (petition). The trial court found that Nuno made the requisite prima facie showing for an evidentiary hearing.

---

[1] All further unspecified statutory references are to the Penal Code.

Nuno subsequently filed a motion for discovery of peace officer personnel records (discovery motion or motion). The motion sought disclosure of information concerning two former police officers who had testified at Nuno's preliminary hearing and whose prior testimony was to be admitted at the impending evidentiary hearing. After an in camera hearing, the court ordered disclosure of certain personnel information regarding each officer. Later, the court held the evidentiary hearing on Nuno's section 1172.6 petition and denied it.

In his opening brief on appeal, Nuno asked this court to review the officers' personnel records to ensure the correctness of the trial court's ruling under *Pitchess* standards but did not argue for reversal of the trial court's order denying his petition. He contended that if this court "finds that the [trial] court improperly applied the *Pitchess* standards, it should conditionally remand the case." In his initial brief, the Attorney General did not object to Nuno's request.

After examining the appellate briefing and record, we requested supplemental briefing on three questions: (1) whether Nuno's appellate request for review of the trial court's application of *Pitchess* standards encompassed the *Brady* component of his discovery motion; (2) whether the state has a duty to disclose evidence under *Brady* in the context of an evidentiary hearing under section 1172.6, subdivision (d); and (3) the appropriate remedy if this court determines that the trial court may have erred in its review of the police personnel records for *Brady* information.

For the reasons explained below, we decide that a petitioner may obtain disclosure of peace officer personnel information under *Brady* principles through *Pitchess* procedures in advance of a section 1172.6 evidentiary hearing. Because the present record does not demonstrate whether the trial court considered *Brady* principles when ruling on Nuno's discovery motion, we conditionally reverse the trial court's order denying relief under section 1172.6 and remand for further proceedings on the motion.

2

# I. FACTS AND PROCEDURAL BACKGROUND

### A. *Complaint and Preliminary Hearing*

In June 2010, the Monterey County District Attorney filed a complaint charging Nuno and two codefendants, Jesse Daniel Perez and Oscar Pineda Pina, with multiple counts of willful, deliberate, and premeditated attempted murder (§§ 664, subd. (a), 187 subd. (a); counts 1–11), assault with a semiautomatic firearm (§ 245, subd. (b); counts 12–22) and shooting at an inhabited dwelling (§ 246; counts 23–34), plus one count of active participation in a criminal street gang (§ 186.22, subd. (a); count 35).[2] All the crimes allegedly occurred on or about May 27, 2010.[3] In addition, the complaint included gang enhancement allegations against all three defendants (§ 186.22, subd. (b)(1)), several personal firearm-use enhancement allegations against Nuno and Perez (§ 12022.5, subd. (a)), and a prior strike allegation (§ 1170.12, subd. (c)(1)) and a prior prison term enhancement allegation (§ 667.5, former subd. (b)) against Nuno.

In September 2010, the trial court held a joint preliminary hearing. The district attorney presented the testimony of four police officers, including King City Police Department Officers Abraham Aguayo and Jesus Yanez. The court held Nuno to answer on 22 charged counts, an additional uncharged offense of possession of a firearm by a felon (§ 12022), all the enhancement allegations, and the prior strike allegation.

### B. *Information, Plea, and Sentencing*

On September 27, the district attorney filed an information charging Nuno and his two codefendants (Perez and Pina) with multiple offenses. Against Nuno, the information alleged 10 counts of willful, deliberate, and premeditated attempted murder (§§ 664, subd. (a), 187 subd. (a); counts 1–10), 10 counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 11–20), shooting at an inhabited dwelling (§ 246; count

---

[2] The complaint also charged codefendant Perez with receiving or concealing stolen property (§ 496, subd. (a); count 36).

[3] Unless otherwise indicated, all dates were in 2010.

21), active participation in a criminal street gang (§ 186.22, subd. (a); count 22), and possession of a firearm by a felon (§ 12022, subd. (a)(1); count 23). As to each attempted murder count and each assault with a semiautomatic firearm count, the information alleged that Nuno personally used a firearm (§ 12022.5, subd. (a)) and committed the offense for the benefit of a gang (§ 186.22, subd. (b)(1)). As to the count for shooting at an inhabited dwelling, the information alleged that Nuno committed the offense for the benefit of a gang (§ 186.22, subd. (b)(1)). The information further alleged that Nuno had suffered a strike prior conviction on May 10, 2004, for assault with a firearm (§§ 245, subd. (a)(2), 1170.12, subd. (c)(1)) and had served a prior prison term for that offense (§ 667.5, former subd. (b)).

On August 23, 2011, pursuant to a plea agreement, Nuno pleaded no contest to one count of attempted murder (count 1) without premeditation and deliberation. He further admitted the attendant firearm-use and gang enhancement allegations and the prior strike allegation. Nuno asserted the preliminary hearing transcript and the discovery disclosed to him provided the factual basis for his plea. Nuno further agreed to a stipulated 30-year prison sentence comprising the lower term of five years for the attempted murder conviction, doubled under strike law, plus 10 years for the firearm-use enhancement and 10 years for the gang enhancement.

On September 8, 2011, in accordance with the plea agreement, the trial court sentenced Nuno to 30 years in prison.

### C. Proceedings on Petition for Resentencing

On February 22, 2022, Nuno filed on his own behalf a petition for resentencing (§ 1172.6).

The trial court appointed counsel for Nuno, received briefing, and heard oral argument from the parties.

In June 2022, the trial court found that Nuno had made a prima facie case for relief and ordered an evidentiary hearing.

4

## 1. Defense Motion for Discovery under *Brady* and *Pitchess*

In August 2022, Nuno's defense counsel filed a motion for discovery of peace officer personnel records of King City Police Department Officers Aguayo and Yanez. Nuno's motion relied, inter alia, on *Brady*, *Pitchess*, Evidence Code sections 1043 through 1046, and state and federal constitutional due process protections. Nuno asserted that his "defense counsel's declaration meets the good cause requirements of *Pitchess* and the materiality standards of *Brady*. The officers' credibility will be the main factors in determining whether or not Nuno committed attempted murder and various enhancements." Nuno further asserted entitlement to "evidence of the officers' custom and habit of falsifying police reports" and attached "media accounts detailing the officers' misbehavior."

The City of King City and the King City Police Department (collectively, King City) filed an opposition to Nuno's discovery motion (opposition). King City asserted that the motion "fails to demonstrate 'good cause' for [] all of the discovery sought," fails to show a " 'plausible factual foundation' . . . for the release of all the confidential personnel records sought," and "is overbroad." Alternatively, King City requested that any disclosure the trial court deemed proper be limited to "those records which are relevant to [Nuno]'s defense and for which good cause has been shown, and that a [p]rotective [o]rder be issued." King City's opposition did not specifically address the *Brady* component of Nuno's motion or assert more generally that Nuno's motion was not authorized in a section 1172.6 proceeding.

On September 20, 2022, the trial court held a hearing on Nuno's motion. Neither King City's counsel nor the district attorney stated any objection to the *Brady* component of Nuno's motion or argued that the motion itself was unauthorized. The court noted that Nuno was required to "allege specific facts showing the records [] are material to the subject matter involved in the pending litigation pursuant to Evidence Code [s]ection 1043." The court found "there is good cause for discovery of the personnel records of the

two specific officers that are referenced in the defense motion, the records which are sought in this matter in connection with the anticipated asserted defense." The court explained that it would "conduct an in-camera hearing to review all potentially relevant documents that correspond to the particular request in the *Pitchess* motion." (Italics added.) The court did not mention the *Brady* component of Nuno's motion.

On September 21, 2022, the trial court conducted an ex parte, in camera hearing to review the officers' personnel records.[4] Regarding Officer Aguayo, the court found the "personnel information relevant and order[ed] personnel record information . . . be disclosed to [d]efense counsel." The information provided to Nuno comprised complainant and witness names (and their available contact information) related to two incidents involving Aguayo that occurred in 2010 (prior to Nuno's 2011 no contest plea), plus any discipline imposed on Aguayo for those incidents. The disclosed information derived from a document in Aguayo's personnel records (dated March 7, 2011), but the trial court did not order disclosure of the document itself. Additionally, regarding Officer Yanez, the court concluded "[t]here were no relevant records responsive to [Nuno]'s *Pitchess* motion" (italics added) and ordered disclosure only of the dates of Yanez's employment with the King City Police Department.

2. Evidentiary Hearing

In anticipation of the evidentiary hearing, the trial court granted the district attorney's motion to admit a redacted version of the preliminary hearing transcript. (See

---

[4] The appellate record includes the reporter's transcript of the in camera hearing and two court exhibits comprising the personnel records of Officers Aguayo and Yanez. The record reveals a potential discrepancy regarding whether the trial court reviewed all or just some of the personnel records brought to the hearing by King City's custodian of records. The hearing transcript suggests that the trial court personally reviewed only one document from Officer Aguayo's personnel file that the custodian identified as relevant. However, a court clerk's docket entry made while this case was pending on appeal states that the personnel records contained in the two court exhibits "were reviewed during the in-camera *Pitchess* [m]otion on September 21, 2022." (Italics added.)

§ 1172.6, subd. (d)(3).) The redacted preliminary hearing transcript included the testimony of Officers Yanez and Aguayo.

In June 2023, the trial court held an evidentiary hearing pursuant to section 1172.6, subdivision (d).[5]

 a. Prosecution Evidence

At the evidentiary hearing, the district attorney presented live testimony from nine witnesses, including codefendants Perez and Pina. The district attorney did not call Officers Aguayo and Yanez as live witnesses but introduced their redacted preliminary hearing testimony.

According to Officer Yanez's preliminary hearing testimony, on May 27, at approximately 10:40 p.m., Yanez was alone in his patrol car in King City when he heard multiple gunshots from the direction of North Third Street. Approximately 30 to 45 seconds later, Yanez saw a white Nissan driving away from the area at a high rate of speed. He followed the Nissan until it came to an abrupt stop at 519 North Mildred. Yanez identified Pina as the driver of the Nissan, Nuno as a passenger in the right front seat, and Perez as a passenger in the right rear seat.[6]

The Nissan's front passenger door opened and Nuno "fell out of the car." From approximately 10 feet away, Officer Yanez saw Nuno holding his waistband and running toward the north end of 519 North Mildred. Yanez lost sight of Nuno but heard what sounded like someone jumping over a chain link fence.

Officer Yanez knew that Perez lived at 519 North Mildred. Yanez and other officers eventually searched that residence and its backyard. The backyard included an aluminum shed that was close to the yard's fence. The police found a semiautomatic

---

[5] The same bench officer decided Nuno's discovery motion and presided over the evidentiary hearing.

[6] On cross-examination, Officer Yanez admitted that he only recognized and identified Nuno after the police had apprehended him, not during their first encounter.

.380 handgun on the top of the shed. The gun had one spent cartridge case lodged in its chamber.

According to Officer Aguayo's preliminary hearing testimony, he assisted with the investigation of the shooting. Aguayo spoke to Officer Yanez and searched the Nissan. Aguayo found a loaded .22 caliber handgun partially tucked under the right front passenger seat and some live .22 caliber rounds on the floorboard. In addition, Aguayo interviewed Perez about his involvement in the shooting.

The next day (May 28), Aguayo (along with Officer Yanez and another officer) spotted Nuno lying in the backseat of a car on South Mildred. When Nuno failed to comply with the officers' orders to show his hands, Aguayo broke into and opened the car. He and Yanez pulled Nuno out of the car. The police found a loaded .22 caliber semiautomatic handgun "behind the front passenger [seat] down at the floorboard."

Officer Aguayo testified Pina had said that "Nuno made the statement 'we're going to shoot at a house.' " However, none of the perpetrators ever said anything to each other about the shooting being gang related. Pina also reported that the only person he saw with a gun in the car was Perez. Aguayo believed that Nuno lived at 605 North Mildred—within one block of 519 North Mildred. Pina lived 14 to 16 blocks away from that area of North Mildred.

According to Officer Steve Hatch's preliminary hearing testimony, Hatch examined the scene of the shooting at a house on North Third Street. Hatch found seven .380 caliber cartridge casings and five .22 caliber cartridge casings on the ground in front of the house. A car parked on the grass in front of the house had bullet holes in it. In addition, there were five bullet holes on the front of the house and several bullet holes/strikes inside the house. The police collected four bullets/projectiles from inside the house. Hatch also examined the .22 caliber handgun and bullets found inside the Nissan.

8

The live testimony presented by the prosecution at the evidentiary hearing included the following facts:

A resident of the house on North Third Street testified that there were approximately six or seven people inside the house at the time of the shooting. A bullet hit one person (a nine-year-old child) in the leg.

Codefendant Perez testified that in 2010, he associated with the Norteño street gang. Nuno never mentioned having any association with the Norteños. For the instant crime, Perez pleaded guilty to attempted murder with a gang enhancement. He received a sentence of 18 years and feels he got what he deserved.

Perez refused to testify about the details of the shooting, claiming that he did not remember the incident and had put it behind him. Nonetheless, Perez admitted that he had a gun while riding in the car with Nuno and Pina. He also admitted that he exited the car in front of the house on North Third Street and shot at it. He testified that Nuno was not present at the shooting and was not a shooter. Perez also testified that Nuno never said "I want somebody to die. Let's go shoot somebody."

Codefendant Pina testified that he had known Nuno for about six months prior to May 2010. Nuno had told Pina that he (Nuno) was affiliated with the Salinas East Market Norteño subset. Pina did not think Perez was part of that gang.

On the day of the shooting, Pina got a call from Perez asking for a ride. When Pina arrived at Perez's house, Nuno was there. Pina drove them to Taco Bell. Nuno sat in the front passenger seat, and Perez sat in the right rear passenger seat. After their stop at Taco Bell, Nuno asked to be dropped off across the street from the scene of the shooting, saying he needed to talk to a friend. Nuno further "said he had some problems with some guys that lived across the street [who] he thought were [Sureño] gang members." Nuno added that "he had [had] an altercation with them two days" earlier.

When Pina stopped his car on North Third Street, Nuno and Perez got out and went to a house across the street from the one that subsequently was fired on. About a

9

minute after Nuno and Perez exited the car, Pina heard seven to eight gunshots. Pina saw both Nuno and Perez shooting, but he could not see if they were shooting in the direction of the house.[7] Nuno and Perez ran back to the car. Nuno told Pina to drop him off at Perez's house and to not say anything to anyone. As Pina drove toward Perez's house, he heard sirens and wanted to stop. Nuno told Pina to keep driving, drop them off, and leave. When they arrived at Perez's house, Pina surrendered to police. Nuno got out of the car and ran toward the backyard of Perez's house.

On cross-examination, Pina acknowledged pleading guilty to shooting at an inhabited dwelling for the benefit of a gang and receiving a three-year sentence. He testified further that neither Nuno nor Perez said he wanted to shoot and kill people. Pina said he did not know Nuno's intentions that night.

Monterey County Sheriff's Office Sergeant Michael Darlington testified that he found a black bandana and semiautomatic pistol on top of a metal shed in the backyard of the house on North Mildred. The pistol was not loaded, but a spent cartridge casing was lodged in it. In addition, the police found several guns inside the house.

Former King City Police Officer Jose Perez testified that around May 2010, King City was having a problem with gangs, and the Norteños and Sureños "were constantly fighting and shooting at each other." On May 3, the police received a report of a shooting at 519 North Mildred. When Officer Perez arrived there, Nuno and Perez were present. Nuno said that he was at the house for a barbeque, and someone had shot at him. Nuno did not want to be named in a police report because he feared retaliation from the shooter and his family.

Officer Hatch testified that the gun police found on top of the shed following the May 27 shooting was a .380 caliber handgun. Hatch saw several bullet holes in a car

---

[7] On cross-examination and redirect, Pina clarified that he only remembered hearing gunshots and said his prior statement to Officer Aguayo (in which he failed to say that he had in fact seen shooting) was more accurate than his direct testimony.

parked in front of the house on North Third Street but did not find any bullets/projectiles in the car. It appeared to Hatch that some of the bullets passed through the car and hit the house.

b. Defense Evidence

The defense presented the testimony of four witnesses at the evidentiary hearing, including Nuno, who testified on his own behalf.

Former Officer Jose Perez testified to knowing codefendant Perez "[f]airly well." According to Officer Perez, codefendant Perez associated with the Norteños in 2010.

Nuno's mother, Teresa V., testified that she knew her son to be an honest person who did not have a problem with anybody. She did not know him as a violent person or as having a reputation for violence. She recalled something about a prior shooting for which Nuno had been arrested. But she did not recall that he had been convicted for assault with a firearm in 2004.

Sulema E., a former resident of North Third Street who knew Nuno through her ex-boyfriend, testified to hearing gunshots on the night of May 27. She did not see the shooting. Nuno had planned to visit Sulema's apartment that night to hang out, but he never arrived. Sulema heard the gunshots while waiting for Nuno to show up. Sulema knew Nuno to be an honest and nonviolent person.

Nuno testified that he was not a gang member at the time of the shooting. He was a gang "dropout" when he was released from prison in 2004 or 2005. He also was a tattoo artist, and none of his tattoos are gang related. Nuno believed that Perez was "somewhat affiliated," and Pina was a "southerner." Nuno had known Pina for a couple of months before the incident and did not know Pina to be violent. They "pretty much just dr[a]nk" together.

On the day of the shooting, Nuno got off work late. As Nuno drove home past Perez's house, Perez flagged him down and asked Nuno if he wanted to drink. Nuno subsequently walked over to Perez's house and drank a beer or two before Pina arrived.

11

Perez asked Pina for a ride to Taco Bell. At Taco Bell, Nuno spoke by phone to Sulema and her boyfriend about visiting Sulema's home to drink. Nuno asked Pina to drop him off at Sulema's place. Nuno rode in the car's front passenger seat as they drove to Sulema's while listening to music. When they arrived at Sulema's home, Nuno exited the car with a 12-pack of beer. Perez decided he wanted to join in the drinking and got out of the car. When Nuno reached the front of Sulema's home, he heard gunshots. Perez was a short distance away from Nuno, in the middle of the street firing a gun. Nuno ducked, dropped his beer, and ran back toward the car. He did not know if anyone returned fire. Nuno did not have a gun or tell Perez to shoot. Nuno thought Perez was shooting into the air and "never kn[ew] him to want to shoot anybody." As the three men drove away, they were quiet. Pina drove back toward Perez's house. Someone handed Nuno a gun that had a black bandana on it. He took the gun because he "didn't know what was really going on" and "was scared." Nuno got out of the car, ran, and "tossed" the gun.

On cross-examination, Nuno explained that he was never a gang member. However, when he went to prison, he was "forced to go somewhere," so he went into general population and "had to be affiliated with somebody." He ended up affiliating with the "North Hispanics." After being released from prison, he lived in Bakersfield until 2010. He then moved to King City and planned to open a tattoo shop. Nuno had lived in Salinas during his senior year of high school. He denied that he was ever involved with the Salinas East Market subset.

Nuno explained that he hid in a car after the shooting because he knew the police were after him. In addition, he was not aware of a second gun inside Pina's car. He only saw the gun that was "put in [his] lap" after he had said he was going to run. He did not see whether Perez had fired one gun or two guns. Nuno did not know the people who were living in the house that was fired on.

c. Ruling Denying Nuno's Petition

On July 13, 2023, the trial court denied Nuno's section 1172.6 petition.

In its ruling, the trial court described some of the evidence presented through the preliminary hearing transcript, including that Officer Yanez had seen Nuno fleeing from the Nissan holding his waistband and that Officer Aguayo had found a loaded .22 caliber handgun in the Nissan and was told that Nuno had said " 'We're going to shoot at a house.' "

The trial court concluded from the evidence presented at the evidentiary hearing that "Nuno, with the intent to kill rival Sure[ñ]o gang members that he believed lived at the North [Third] Street residence, used a .380 caliber semiautomatic handgun to fire live rounds at that same residence at North [Third] Street alongside Jesse Daniel Perez. And [Nuno] acted with the intent to kill rival Sure[ñ]o gang members that he believed lived at that residence when he committed the crime of attempted murder on May 27th of 2010." The court further concluded that "Nuno, as one of two shooters that fired several rounds at the small North [Third] Street residence in which one of those rounds penetrated the leg of a nine-year-old child, acted with the intent to kill when he committed the offense of attempted murder."

## II. DISCUSSION

Nuno does not directly challenge the trial court's finding that the district attorney proved him guilty of attempted murder under current law (see § 1172.6, subd. (d)). Rather, in his opening brief, Nuno asked this court to review the police personnel records of Officers Aguayo and Yanez to determine whether the trial court correctly ruled on his discovery motion—specifically, whether the trial court properly "applied the *Pitchess* standards." In his brief, Nuno did not mention the *Brady* component of his motion. In his respondent's brief, the Attorney General stated no objection to Nuno's appellate request and, like Nuno, did not mention *Brady*.

13

After examining the parties' briefing and the record, this court asked for supplemental briefing on whether Nuno's appellate request invoking *Pitchess* standards also encompassed his motion's request that the trial court order disclosure of information favorable to him under *Brady*.

The parties agree in their supplemental briefing that Nuno's appellate request encompasses the *Brady* component of his discovery motion. Under our Supreme Court's precedent, the *Pitchess* process " ' "operates in parallel with *Brady*" ' " and "all information that the trial court finds to be exculpatory and material under *Brady* must be disclosed, notwithstanding Evidence Code section 1045's limitations." (*People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 720 (*Johnson*), quoting *City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 14.) Given this general principle, and because the Attorney General makes no argument that Nuno forfeited appellate review of the trial court's ruling under *Brady* principles by failing to specifically request such review in his opening brief, we decide that Nuno's original appellate request encompasses the principles applicable under both *Pitchess* and *Brady*.

Furthermore, until this court requested supplemental briefing, at no point did counsel for King City or the People assert that Nuno's discovery motion itself is unauthorized in a section 1172.6 proceeding. As mentioned *ante* (pt. I.C.1.), neither King City's counsel nor the district attorney argued that the trial court lacked the authority to grant Nuno's motion. The Attorney General similarly did not make such an argument in his respondent's brief. Instead, the Attorney General said he "does not object to this [c]ourt reviewing the trial court's sealed in camera *Pitchess* motion records and proceedings."

Notwithstanding the Attorney General's initial acquiescence to our review of the trial court's ruling on Nuno's discovery motion, in his supplemental briefing, the Attorney General states the following about *Pitchess* motions in section 1172.6 proceedings: "Although most *Pitchess* motions are filed before trial, courts have

14

permitted such motions to be brought after trial in connection with posttrial motions and habeas corpus proceedings. [Citations.] It is unclear whether the *Pitchess* process is permitted in the context of a resentencing petition." The Attorney General further states: "In regard to *Brady*, there does not appear to be any case law yet on the discovery obligations imposed on prosecutors when it comes to resentencing hearings . . . as authorized by Penal Code section 1172.6. However, there is a strong suggestion that the entitlement to post-conviction discovery is not cognizable in Penal Code section 1172.6 proceedings."[8]

Given the lack of any clear opposition by King City or the People (either in the trial court or on appeal) to the propriety of Nuno's discovery motion itself, we decide that Nuno's motion is authorized in the context of the evidentiary hearing ordered by the trial court pursuant to section 1172.6. (See *Eulloqui v. Superior Court* (2010) 181 Cal.App.4th 1055, 1063–1068 (*Eulloqui*) [permitting disclosure under *Brady* through *Pitchess* procedures in connection with an evidentiary hearing in a habeas corpus proceeding]; see also *People v. Johnson* (2013) 218 Cal.App.4th 938, 943 [the Court of Appeal independently reviewed a trial court's ruling on a *Pitchess* motion filed in conjunction with a probation revocation hearing]; Evid. Code, § 1043, subd. (a).)

Having decided that, under the present circumstances, Nuno's discovery motion is authorized and the *Pitchess* and *Brady* components of the motion are implicated in our review of the trial court's ruling on the motion, we must address whether *Brady* principles apply in the context of a motion for discovery of police personnel records filed in connection with an evidentiary hearing under section 1172.6, subdivision (d).

---

[8] To support this contention, the Attorney General cites *People v. Strong* (2022) 13 Cal.5th 698, 713 (*Strong*) and includes the following parenthetical explanation: "resentencing proceedings under the statute involve 'prospective relief from a murder conviction that was presumptively valid at the time,' not the correction of 'errors in past factfinding.' "

In his supplemental briefing to this court, Nuno asserts that "the duty to disclose *Brady* material exists before, during or after trial." He further contends that "he meets the standards of Penal Code section 1054.9 and is authorized to conduct post-conviction discovery."[9] Regarding section 1172.6 specifically, Nuno asserts that that statute "implicitly authorizes discovery" (citing § 1172.6, subd. (f)[10]) and "does not limit a defendant's right to conduct post-conviction discovery pursuant to section 1054.9."[11]

The Attorney General equivocates on whether *Brady* principles apply to section 1172.6 hearings. He states, for example: "Criminal defendants are not constitutionally entitled to *Brady* disclosure in connection with Penal Code section 1172.6 resentencing hearings because *Brady* is a pre-conviction trial right and is not applicable to post-conviction proceedings. However, while there is no constitutional post-verdict discovery duty, prosecutors are ethically bound to disclose exculpatory material that is known to them during the resentencing process." He also suggests, "In the case of evidentiary

---

[9] Section 1054.9 provides in relevant part: "(a) In a case in which a defendant is or has ever been convicted of a serious felony or a violent felony resulting in a sentence of 15 years or more, upon the prosecution of a postconviction writ of habeas corpus or a motion to vacate a judgment, . . . and on a showing that good faith efforts to obtain discovery materials from trial counsel were made and were unsuccessful, the court shall . . . order that the defendant be provided reasonable access to any of the materials described in subdivision (c). [¶] . . . [¶] (c) For purposes of this section, 'discovery materials' means materials in the possession of the prosecution and law enforcement authorities to which the same defendant would have been entitled at time of trial."

[10] Section 1172.6, subdivision (f) provides: "This section does not diminish or abrogate any rights or remedies otherwise available to the petitioner."

[11] Notwithstanding Nuno's reliance on section 1054.9 in his supplemental brief, he does not point this court to any place in the record where he invoked section 1054.9 in the trial court as authority for his discovery motion. Likewise, our examination of the record has failed to locate any mention by Nuno of section 1054.9 in the trial court. Therefore, we do not consider whether Nuno may be entitled to discovery of police personnel information under *Pitchess* and *Brady* principles pursuant to section 1054.9. (Cf. *Hurd v. Superior Court* (2006) 144 Cal.App.4th 1100, 1105 [holding that section 1054.9 authorizes a pre-habeas corpus proceeding motion for discovery of peace officer personnel records under *Pitchess* and Evidence Code section 1043].)

hearings held in conjunction with the resentencing (as occurred in [Nuno]'s case) [] it is likely what discovery obligations do exist would be akin to those applicable at other post-conviction probation or parole revocation hearings." In concluding his supplemental argument, the Attorney General contends, "petitioners are not entitled to post-conviction *Brady* disclosure in connection with Penal Code section 1172.6 hearings. . . . [T]he thrust of Penal Code section 1172.6 is 'prospective relief from a murder conviction that was presumptively valid at the time,' not the correction of 'errors in past factfinding.' (*People v. Strong*, *supra*, 13 Cal.5th at p. 713.) In any event, even assuming that due process requires the disclosure of favorable material evidence at a Penal Code section 1172.6 evidentiary hearing, the definition of materiality would be tied to the nature of the hearing."

As the parties acknowledge, there is no precedent addressing whether the state has an obligation to disclose evidence under *Brady* in the context of a section 1172.6 evidentiary hearing. Before analyzing the trial court's ruling under *Pitchess* principles (as jointly requested by the parties in their initial briefing) and whether *Brady* principles apply in the present context, we outline relevant principles concerning section 1172.6, *Pitchess*, and *Brady*.

    A. *Legal Principles*

        1. Section 1172.6

Senate Bill No. 1437 (Senate Bill 1437) (2017–2018 Reg. Sess.) took effect on January 1, 2019. (See Stats. 2018, ch. 1015, § 4.) "With the goal of 'more equitably sentenc[ing] offenders in accordance with their involvement in homicides' [citation], Senate Bill 1437 significantly changed the scope of murder liability for defendants who did not actually kill or intend to kill anyone, including those prosecuted on a felony-murder theory." (*People v. Wilson* (2023) 14 Cal.5th 839, 868 (*Wilson*).) "The bill also altered murder liability under the natural and probable consequences doctrine." (*Ibid.*, fn. 8.) Additionally, Senate Bill 1437 "created a special procedural mechanism for those

convicted under the former law to seek retroactive relief under the law as amended." (*Strong*, *supra*, 13 Cal.5th at p. 708.)

By its express terms, Senate Bill 1437 did not authorize a petition to vacate a conviction for any offense other than murder. After the enactment of Senate Bill 1437, the California Courts of Appeal were split on whether Senate Bill 1437 applied to attempted murder. "In October 2021, the Governor signed Senate Bill No. 775, (Stats. 2021, ch. 551, § 2), effective January 1, 2022." (*People v. Coley* (2022) 77 Cal.App.5th 539, 544.) Senate Bill No. 775 resolved the split of authority and amended former section 1170.95 in several respects, "including (1) clarifying that, in some circumstances, the same relief available to persons convicted of murder is also available to persons convicted of attempted murder or manslaughter [citations]; and (2) addressing various aspects of the petition procedure." (*People v. Birdsall* (2022) 77 Cal.App.5th 859, 865, fn. omitted.) On June 30, 2022, the statute was renumbered as section 1172.6 without further substantive changes. (Stats. 2022, ch. 58, § 10.)

When the trial court receives a petition under section 1172.6 requesting vacatur of a conviction and resentencing, and "containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' [Citations.] If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition." (*Strong*, *supra*, 13 Cal.5th at p. 708, citing *People v. Lewis* (2021) 11 Cal.5th 952, 970–972; § 1172.6, subd. (c).) "Otherwise, the court must issue an order to show cause [citation] and hold an evidentiary hearing at which the prosecution bears the burden 'to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under the law as amended by Senate Bill 1437." (*Wilson*, *supra*, 14 Cal.5th at p. 869; § 1172.6, subd. (d)(3).)

"The trial court acts as an independent fact finder to determine whether the prosecution has met its burden [citation] but the trial court's factual determinations are

18

limited to 'issues made relevant by the changes to the law effected by [the amendments].' " (*People v. Rodriguez* (2024) 103 Cal.App.5th 451, 457 (*Rodriguez*).) "A section 1172.6 petition for resentencing is a continuation of the petitioner's underlying criminal proceeding . . . . It does not permit ' "litigat[ing] anew" any trial issues or allowing "a petitioner to challenge any aspect of the factfinding from the original trial that [they] wish[] to revisit." ' [Citation.] It is not a ' "trial de novo on all the original charges." . . . [I]t is a postconviction . . . 'act of lenity' . . . allowing for the retroactive application of the new law governing accomplice liability.' " (*Ibid.*; see also *Sandoval v. Superior Court* (2023) 95 Cal.App.5th 1274, 1287 ["a postappeal Penal Code section 1172.6 proceeding does not constitute a new trial" within the meaning of Code of Civil Procedure section 170.6, subdivision (a)(2)].)

## 2. *Pitchess* and *Brady*

In *Pitchess*, *supra*, 11 Cal.3d 531, the California Supreme Court "recognized that a criminal defendant may, in some circumstances, compel the discovery of evidence in the arresting law enforcement officer's personnel file that is relevant to the defendant's ability to defend against a criminal charge. 'In 1978, the California Legislature codified the privileges and procedures surrounding what had come to be known as "*Pitchess* motions" . . . through the enactment of Penal Code sections 832.7 and 832.8 and Evidence Code sections 1043 through 1045.' [Citation.] By providing that the trial court should conduct an in camera review, the Legislature balanced the accused's need for disclosure of relevant information with the law enforcement officer's legitimate expectation of privacy in his or her personnel records."[12] (*People v. Mooc* (2001) 26 Cal.4th 1216, 1219–1220 (*Mooc*).)

_____

[12] Former subdivision (b)(1) of Evidence Code section 1045 excluded from disclosure any " '[i]nformation consisting of complaints concerning conduct occurring more than five years before the event or transaction that is the subject of the litigation in aid of which discovery or disclosure is sought.' " *People v. McDaniel* (2021) 12 Cal.5th

Evidence Code section 1043, subdivision (a) provides in relevant part: "In any case in which discovery or disclosure is sought of peace or custodial officer personnel records or records maintained pursuant to [s]ection 832.5 . . . or information from those records, the party seeking the discovery or disclosure shall file a written motion with the appropriate court or administrative body upon written notice to the governmental agency that has custody and control of the records." The motion must proffer certain information (*id*., subd. (b)), including "[a]ffidavits showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation" (*id*., subd. (b)(3)).

"To show good cause as required by [Evidence Code] section 1043, defense counsel's declaration in support of a *Pitchess* motion must propose a defense or defenses to the pending charges. The declaration must articulate how the discovery sought may lead to relevant evidence or may itself be admissible direct or impeachment evidence [citations] that would support those proposed defenses. These requirements ensure that only information 'potentially relevant' to the defense need be brought by the custodian of the officer's records to the court for its examination in chambers." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1024; see also *People v. Hustead* (1999) 74 Cal.App.4th 410, 417 [noting that "cases have held that *Pitchess* motions are proper for issues relating to credibility"].)

"*Pitchess* 'good cause' is a 'relatively relaxed standard[]' intended to 'insure the production for inspection of all potentially relevant documents.' " (*Young v. Superior Court* (2022) 79 Cal.App.5th 138, 158.) "Good cause for *Pitchess* purposes must be supported by an affidavit setting forth a reasonable belief that the requested discovery is

97, 134 (*McDaniel*.) However, Senate Bill No. 16, effective January 1, 2022, eliminated the five-year restriction. (Stats. 2021, ch. 402, § 1; see also *McDaniel*, at p. 134 [explaining that notwithstanding the exclusion period in former subdivision (b)(1) of Evidence Code section 1045, "disclosure of such information may still be required under *Brady*."].)

20

material to the subject matter of the case.  The *Pitchess* materiality requirement also places a burden on the movant to 'propose a defense or defenses to the pending charges' and a 'logical link between the defense proposed and the pending charge.' " (*Id.* at p. 159.)

If the trial court finds good cause, the court must hold an in camera hearing, during which the custodian of records brings "all documents 'potentially relevant' to the defendant's motion." (*Mooc, supra*, 26 Cal.4th at p. 1226; see also *McDaniel, supra*, 12 Cal.5th at p. 134.)  "Subject to statutory exceptions and limitations . . ., the trial court should then disclose to the defendant 'such information [that] is relevant to the subject matter involved in the pending litigation.' " (*Mooc*, at p. 1226.)  " ' "The court may not disclose . . . conclusions drawn during an investigation, or facts so remote or irrelevant that their disclosure would be of little benefit." ' " (*McDaniel*, at p. 134; see also Evid. Code, § 1045, subd. (b) [court "shall exclude from disclosure"]; *id.*, subd (b)(1) ["[i]n any criminal proceeding the conclusions of any officer investigating a complaint filed [by a member of the public] pursuant to [s]ection 832.5"]; *id.*, subd (b)(2) [and "[f]acts sought to be disclosed that are so remote as to make disclosure of little or no practical benefit"].)

"Although not required by the statutory scheme, the 'courts have generally refused to disclose verbatim reports or records of any kind from peace officer personnel files, ordering instead . . . that the agency reveal only the name, address and phone number of any prior complainants and witnesses and the dates of the incidents in question.' " (*Alvarez v. Superior Court* (2004) 117 Cal.App.4th 1107, 1112.)  "Nonetheless, the practice of disclosing only the name of the complainant and contact information must yield to the requirement of providing sufficient information to prepare for a fair trial." (*Ibid.*)  For example, if the movant's ability to investigate the limited, disclosed information to determine whether it would lead to the discovery of admissible evidence has been stymied by a deputy sheriff's refusal to cooperate, "[t]he only way [movant] can effectively investigate this matter before trial is to be given the deputy's statements.

21

[Movant] therefore has established 'good cause' for the information within the meaning of [Evidence Code] section 1043, subdivision (b)(3). To deny him access to this information would constitute an abuse of discretion." (*Id*. at p. 1113, italics omitted.)

Regarding the state's obligation to disclose information under *Brady*, "[t]he Fourteenth Amendment to the federal Constitution prohibits states from denying any person due process of law. This guarantee of due process affords criminal defendants the right to a fair trial, 'impos[ing] on States certain duties consistent with their sovereign obligation to ensure "that 'justice shall be done.' " ' " (*Association for Los Angeles Deputy Sheriffs v. Superior Court* (2019) 8 Cal.5th 28, 39 (*Association*).)

"One special obligation that a prosecutor bears under our system pertains to the disclosure of evidence favorable to a defendant. That duty 'trace[s] its origins to early 20th-century strictures against misrepresentation and is of course most prominently associated with [the United States Supreme] Court's decision in *Brady* . . . .' [Citation.] 'Under *Brady* . . . and its progeny, the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence [(so-called "*Brady* material")].' [Citation.] ' "The obligation is not limited to evidence the prosecutor's office itself actually knows of or possesses, but includes 'evidence known to the others acting on the government's behalf in the case, including the police.' " ' " (*In re Jenkins* (2023) 14 Cal.5th 493, 504–505 (*Jenkins*).)

" 'For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness.' [Citations.] Evidence is material ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' " (*Association*, *supra*, 8 Cal.5th at p. 40.) "This materiality standard applies both after judgment, when evaluating whether *Brady* was violated, and before judgment, when evaluating whether evidence favorable to the defense must be disclosed. [Citations.] Because it may be difficult to know before judgment what evidence will ultimately prove material, 'the prudent

22

prosecutor will resolve doubtful [*Brady*] questions in favor of disclosure.' [Citations.] Statutory and ethical obligations may require even more." (*Ibid.*)

A *Pitchess* motion may be used to obtain *Brady* material contained in a peace officer's confidential personnel file. (*Johnson*, *supra*, 61 Cal.4th at pp. 705–706.) Because the *Pitchess* process operates in parallel with *Brady*, a trial court must disclose all information that is exculpatory and material under *Brady*, "notwithstanding Evidence Code section 1045's limitations." (*Id*. at p. 720; see also *People v. Gaines* (2009) 46 Cal.4th 172, 184 (*Gaines*) ["the *Brady* duty of disclosure, like the duty announced in *Pitchess*, extends to impeachment evidence"].) When a *Pitchess* motion involves a request for potential *Brady* material, a defendant must provide some explanation to the trial court regarding how the officer's credibility might be relevant to the proceeding. (*Johnson*, at p. 721.) "If the movant shows that the request is 'relevant to the pending charges, and explains how, the materiality requirement [of Evidence Code section 1043, subdivision (b)(3)] will be met.' [Citations.] If information is 'material' within the meaning of *Brady*, it is necessarily material 'to the subject matter involved in' a criminal prosecution." (*Association*, *supra*, 8 Cal.5th at pp. 41–42; see also *Johnson*, at pp. 711–712, 721.)

" '[T]rial courts are granted wide discretion when ruling on motions to discover police officer personnel records.' " (*California Highway Patrol v. Superior Court* (2000) 84 Cal.App.4th 1010, 1019.) "On appeal, this court is required to review the 'record of the documents examined by the trial court' and determine whether the trial court abused its discretion in refusing to disclose the contents of the officer's personnel records." (*People v. Rodriguez* (2011) 193 Cal.App.4th 360, 366; see also *People v. Jackson* (1996) 13 Cal.4th 1164, 1220 ["A trial court's decision on the discoverability of material in police personnel files is reviewable under an abuse of discretion standard."].)

"[T]he proper remedy when a trial court has erroneously rejected a showing of good cause for *Pitchess* discovery and has not reviewed the requested records in camera

23

is not outright reversal, but a conditional reversal with directions to review the requested documents in chambers on remand." (*Gaines*, *supra*, 46 Cal.4th at p. 180.) "After reviewing the confidential materials in chambers, the trial court may determine that the requested personnel records contain no relevant information" and "reinstate the judgment." (*Id*. at p. 181.) "It is also possible for the trial court to determine on remand that relevant information exists and should be disclosed. . . . [I]n that event, that the trial court 'must order disclosure, allow [defendant] an opportunity to demonstrate prejudice, and order a new trial if there is a reasonable probability the outcome would have been different had the information been disclosed.' " (*Ibid*.)

A defendant is not entitled to reversal per se. "To obtain relief, [] a defendant who has established that the trial court erred in denying *Pitchess* discovery must also demonstrate a reasonable probability of a different outcome had the evidence been disclosed." (*Gaines*, *supra*, 46 Cal.4th at p. 182.) "The reasonable-probability standard of prejudice [courts] have applied in *Pitchess* cases is the same standard [courts] have applied generally to claims that the prosecution improperly withheld exculpatory evidence in violation of a defendant's right to due process" under *Brady*. (*Id*. at p. 183.) "[A] trial court's finding that information is material within the meaning of the *Pitchess* scheme does not mean that it is material within the meaning of *Brady*, for these two legal schemes 'employ different standards of materiality.' [Citation.] 'Our state statutory scheme allowing defense discovery of certain officer personnel records creates both a broader and lower threshold for disclosure than does the high court's decision in *Brady* . . . . Consequently, a finding that material evidence was wrongfully withheld under *Pitchess* does not invariably mean that a defendant's right to due process was denied, 'since "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." ' " (*Ibid*.)

24

### B. Analysis

In ruling on Nuno's discovery motion, the trial court ordered disclosure of only complainant and witness names and contact information related to two 2010 incidents involving Officer Aguayo, as well as Officer Yanez's dates of employment with the King City Police Department. (See pt. I.C.1., *ante*.) Bearing *Pitchess* principles in mind, this court has reviewed the transcript of the trial court's September 21, 2022 in camera hearing and the personnel records of Officers Aguayo and Yanez that the trial court transmitted to us. Based on that review, we conclude the trial court did not abuse its discretion under *Pitchess* principles in ordering the disclosure of only limited information regarding Officers Aguayo and Yanez.[13]

Notwithstanding the correctness of the trial court's ruling on Nuno's discovery motion under *Pitchess* principles, we turn to whether further disclosure of information concerning the officers may have been required under *Brady* principles.

We acknowledge that *Brady* is essentially a trial right (see *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 378 (*Izazaga*); *United States v. Ruiz* (2002) 536 U.S. 622, 628; see also *People v. Gutierrez* (2013) 214 Cal.App.4th 343, 348–349 [*Brady* obligation applies to preliminary hearings]) and may not directly apply in postjudgment proceedings. (See *District Attorney's Office for Third Judicial Dist. v. Osborne* (2009) 557 U.S. 52, 69 (*Osborne*) ["*Brady* is the wrong framework" to assess due process concerns postjudgment]; see also *People v. Davis* (2014) 226 Cal.App.4th 1353, 1366 (*Davis*) ["A convicted defendant does not have a right to a postjudgment discovery order 'based on *Brady* alone, independent of section 1054.9.' "]; cf. *Barnett v. Superior Court*

---

[13] As noted above (see fn. 4, *ante*), there is some uncertainty in the record whether the trial court reviewed all the personnel records that were transmitted to this court. Given this uncertainty and because we otherwise remand this matter for in camera review of the personnel records, if the trial court did not previously review the complete personnel files brought by the custodian of records, the court on remand should review the complete personnel records of Officers Aguayo and Yanez to fully ensure disclosure of all discoverable information under *Pitchess* principles.

(2010) 50 Cal.4th 890, 894 [concluding that defendants seeking postconviction discovery under section 1054.9 "must show a reasonable basis to believe that specific requested materials actually exist," but "they do not additionally have to show that they are material within the meaning of *Brady*"].)

Although *Brady* "secure[s] a fair trial as required by the due process clause" (*Izazaga*, *supra*, 54 Cal.3d at p. 378), California appellate courts have acknowledged that "the People's obligations under *Brady* are ongoing, even postjudgment." (*Davis*, *supra*, 226 Cal.App.4th at p. 1366; *People v. Garcia* (1993) 17 Cal.App.4th 1169, 1179 ["The duty of disclosure [] does not end when the trial is over."].) In the same vein, our Supreme Court recently "conclude[d] that where a habeas corpus petitioner claims not to have received a fair trial because a trial prosecutor failed to disclose material evidence in violation of *Brady* – and where the Attorney General has knowledge of, or is in actual or constructive possession of, evidence that the trial prosecutor suppressed in violation of *Brady* – the Attorney General has a constitutional duty under *Brady* to disclose the evidence." (*Jenkins*, *supra*, 14 Cal.5th at p. 512, fn. omitted.) Our high court explained that the purpose of habeas corpus proceedings is to " ' " 'hold open a final possibility for prisoners to prove their convictions were obtained unjustly.' " ' " (*Jenkins*, *supra*, 14 Cal.5th at p. 508.) The court added, "Under *Brady* and its progeny, securing a conviction by failing to disclose material exculpatory evidence violates due process. [Citations.] Imposing a continuing duty of disclosure on the government in this context is consistent with both the due process right on which *Brady* is based, and the 'principles of substantial justice' on which our state's long-standing habeas corpus tradition is founded." (*Ibid*.)

In addition to relying on *Brady* principles, the *Jenkins* court invoked Rule 3.8(d) of the Rules of Professional Conduct (Rule 3.8(d)) to conclude that "in responding to a petition for writ of habeas corpus alleging a *Brady* violation, the Attorney General has an ethical duty to make timely disclosure to the petitioner of all evidence or information known to the Attorney General that was available but not disclosed at trial that the

26

Attorney General knows or reasonably should know tends to negate the guilt of the petitioner, mitigate the offense, or mitigate the sentence, except when the Attorney General is relieved of this responsibility by a protective order of the tribunal."[14] (*Jenkins*, *supra*, 14 Cal.5th at p. 518, fn. omitted.)

Unlike a habeas corpus proceeding—which " ' "often represents a prisoner's last chance to obtain judicial review" of a criminal conviction' " (*Jenkins*, *supra*, 14 Cal.5th at p. 508)—a proceeding under section 1172.6 "seek[s] prospective relief from a murder conviction that was presumptively valid at the time." (*Strong*, *supra*, 13 Cal.5th at p. 713.) Thus, a section 1172.6 proceeding is distinct from a habeas corpus proceeding in that the former does not involve a review of the conviction to "correct[] errors in past factfinding." (*Ibid*.) Nevertheless, our Legislature has afforded petitioners in section 1172.6 proceedings certain procedural rights that seemingly enhance their ability to obtain relief, including the right to appointed counsel upon submission of a facially sufficient petition. (§ 1172.6, subd. (b)(3).)

At the evidentiary hearing stage, the Legislature has placed on the prosecution the burden "to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) The Legislature also has mandated that the admission of evidence is governed by the Evidence Code (with an exception for previously admitted evidence that is admissible under current law), the prosecution and the petitioner may proffer new evidence, and if the prosecution fails to sustain its burden, the murder or attempted murder conviction must be vacated, and the

---

[14] In *Jenkins*, the evidence underlying petitioner's *Brady* claim comprised juvenile court adjudications subject to disclosure restrictions contained in Welfare and Institutions Code section 827. (*Jenkins*, *supra*, 14 Cal.5th at pp. 523–524.) The *Jenkins* court described the statutory procedures allowing a juvenile court to conduct an in camera review of juvenile records for *Brady* material and explained how the Attorney General could comply with his disclosure duties without contravening the statutory restrictions. (*Id*. at pp. 524–527.)

petitioner must be resentenced. (*Ibid.*) While section 1172.6 makes no mention of discovery at any stage of the proceeding, "[a] state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right." (*Connecticut Board of Pardons v. Dumschat* (1981) 452 U.S. 458, 463.) In turn, traditional principles of fundamental fairness apply to state-created procedures governing postconviction relief. (See *Osborne*, *supra*, 557 U.S. at pp. 69–70.)

In examining whether fundamental fairness encompasses disclosure of peace officer personnel information under *Brady* principles in advance of a section 1172.6 evidentiary hearing, we are mindful that such a hearing "is not a ' "trial de novo on all the original charges" ' " but " ' "a postconviction . . . 'act of lenity." ' " (*Rodriguez*, *supra*, 103 Cal.App.5th at p. 457.) Hence, a section 1172.6 petitioner does not enjoy "the full panoply of rights" due a defendant at a criminal trial (*Morrissey v. Brewer* (1972) 408 U.S. 471, 480) and the State "has more flexibility in deciding what procedures are needed in the context of postconviction relief." (*Osborne*, *supra*, 557 U.S. at p. 69.)

A petitioner who seeks relief under section 1172.6 has previously been convicted at a presumptively fair trial proceeding. Nonetheless, once the trial court issues an order to show cause (OSC) and orders an evidentiary hearing on a section 1172.6 petition, the prosecution bears the burden of proving beyond a reasonable doubt petitioner's guilt under murder/attempted murder law effected by Senate Bill 1437. In this respect, a section 1172.6 evidentiary hearing resembles a criminal trial. (See *Torres v. Superior Court* (2023) 94 Cal.App.5th 497, 515 [acknowledging that "a hearing under section 1172.6, subdivision (d)(3) more closely resembles a trial" than a resentencing hearing on remand after an appeal]; cf. *Osborne*, *supra*, 557 U.S. at p. 68 [noting that the state "has more flexibility in deciding what procedures are needed in the context of postconviction relief" because " '[g]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty' "].) Given the similitude of a section 1172.6 hearing and a criminal trial, the disclosure of *Brady* material in connection to a section

28

1172.6 evidentiary hearing promotes the search for truth in adjudicating petitioner's guilt under the law as amended by Senate Bill 1437. (*In re Ferguson* (1971) 5 Cal.3d 525, 531 (*Ferguson*) ["The search for truth is not served but hindered by the concealment of relevant and material evidence."].)

The importance of disclosure of *Brady* material at a section 1172.6 evidentiary hearing is further bolstered by a comparison to discovery procedures applicable to post-OSC habeas corpus proceedings. "A habeas corpus petitioner bears the burden of establishing that the judgment under which he or she is restrained is invalid. [Citation.] To do so, he or she must prove, by a preponderance of the evidence, facts that establish a basis for relief on habeas corpus." (*In re Visciotti* (1996) 14 Cal.4th 325, 351.) As with section 1172.6, there is no statutory authority expressly authorizing discovery in a habeas corpus proceeding (except under section 1054.9). (See *Board of Prison Terms v. Superior Court* (2005) 130 Cal.App.4th 1212, 1241.) Nevertheless, discovery is available to a petitioner in a habeas corpus proceeding "once [a court] ha[s] issued an order to show cause" (*In re Scott* (2003) 29 Cal.4th 783, 814) and "[t]he nature and scope of discovery in habeas corpus proceedings has generally been resolved on a case-by-case basis." (*Id*., at p. 813.) Trial courts are tasked "with 'fashion[ing] a fair discovery rule' " in habeas corpus proceedings (*Jimenez v. Superior Court* (2019) 40 Cal.App.5th 824, 831), and "the discovery . . . must be relevant to the issues upon which the petition states a prima facie case for relief and an order to show cause has issued." (*Board of Prison Terms*, at p. 1243.) Further, regarding the applicability of *Pitchess* and *Brady* principles in habeas corpus proceedings, one Court of Appeal has upheld the disclosure of police personnel information relevant to impeachment under *Brady* through *Pitchess* procedures in connection to a habeas corpus evidentiary hearing. (See *Eulloqui*, *supra*, 181 Cal.App.4th at p. 1068.)

Under section 1172.6, if the prosecution fails to sustain its burden of proof at the evidentiary hearing, a petitioner's "prior conviction, and any allegations and

29

enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Id.*, subd. (d)(3).) Thus, petitioners who state a prima facie case for relief attain a significant interest in the potential vacatur of their murder or attempted murder conviction and reduction of their sentence following the evidentiary hearing. Disclosure of material exculpatory evidence in conjunction with the evidentiary hearing protects that significant interest. It also protects the state's and petitioner's interest in an accurate determination of the facts satisfying the prosecution's beyond-a-reasonable-doubt burden in the face of any defense petitioner may present. (See *Ferguson*, *supra*, 5 Cal.3d at p. 531 [the district attorney's duty "is not to obtain convictions, but to fully and fairly present to the court the evidence material to the charge upon which the defendant stands trial"]; *People v. Gray* (2023) 15 Cal.5th 152, 163 [noting that " 'both the People and the probationer or parolee have a continued post-conviction interest in accurate fact-finding and the informed use of discretion by the trial court' "].)

Moreover, in accord with the Attorney General's acknowledgement here that "prosecutors are ethically bound to disclose exculpatory material that is known to them during the [section 1172.6] resentencing process," disclosure of material exculpatory evidence by the trial court upon an in camera review of peace officer personnel records is consistent with a prosecutor's ethical duty under Rule 3.8(d).[15] (*Johnson*, *supra*, 61

---

[15] Rule 3.8(d) provides that the prosecutor in a criminal case shall "make timely disclosure to the defense of all evidence or information known to the prosecutor that the prosecutor knows or reasonably should know tends to negate the guilt of the accused, mitigate the offense, or mitigate the sentence, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal." Regarding peace officer personnel records, our Supreme Court has explained that "[i]f the prosecution informs the defense of what it knows regarding information in confidential personnel records, and the defense can seek that information itself [by filing a *Pitchess* motion], no evidence has been suppressed." (*Johnson*, *supra*, 61 Cal.4th at p. 715; see also *id.* at p. 716 ["the prosecution fulfills its *Brady* obligation if it shares with the defendant any information it

Cal.4th at p. 717 [noting that the United States Supreme Court "has held that when confidential records might contain exculpatory material, the trial court's in camera review of those records, followed by disclosure to the defense of any *Brady* material that review uncovers, is sufficient to protect the defendant's due process rights."].)

Considering the nature and purpose of a section 1172.6 evidentiary hearing, the precedent concerning discovery and disclosure of exculpatory evidence in the context of habeas corpus proceedings, and the ethical obligations of a prosecutor in a criminal proceeding, we decide that principles of fundamental fairness require disclosure of material exculpatory evidence (including potential impeaching evidence) that exists in a peace officer's personnel file upon a sufficient motion filed under *Brady*, *Pitchess*, and its statutory progeny after the trial court has ordered an evidentiary hearing under section 1172.6, subdivision (d).

Having decided that disclosure of peace officer personnel information under *Brady* principles through *Pitchess* procedures in advance of a section 1172.6 evidentiary hearing may be required, we turn to examining the instant record to determine whether the trial court satisfied that requirement in ruling on Nuno's discovery motion. The Attorney General asserts that if this court determines that Nuno is entitled to *Brady* disclosure in connection with his evidentiary hearing and "the *Brady* disclosure falls within the limited scope of matters material to whether [Nuno] intended to kill when he committed the offense of attempted murder, then the appropriate remedy should be similar to that described in *People v. Gaines* (2009) 46 Cal.4th 172 as relevant to the appellate review of *Pitchess* proceedings." By contrast, Nuno asserts that if this court were to conclude that a

_____

has regarding whether the personnel records contain *Brady* material, and then lets the defense decide for itself whether to file a *Pitchess* motion"].) The present record does not indicate whether the district attorney made any disclosure to Nuno regarding the personnel records of Officers Aguayo and Yanez prior to Nuno filing his discovery motion.

*Brady* violation occurred, the appropriate remedy is a reversal and remand for a new evidentiary hearing.

As detailed *ante* (see pt. I.C.1.), King City did not respond to the *Brady* component of Nuno's discovery motion, and the trial court did not mention *Brady* when addressing the motion. Hence, it is unclear whether the trial court in fact considered if, under *Brady* principles and notwithstanding the limitations of Evidence Code section 1045 or other *Pitchess* principles, disclosure of information beyond that which was ordered disclosed to Nuno regarding Officers Aguayo and Yanez would be appropriate.[16]

Because the record does not disclose whether the trial court considered *Brady* principles in deciding Nuno's discovery motion, a conditional reversal and remand are appropriate to allow for consideration of the *Brady* component of Nuno's motion by the trial court in the first instance. (See *Gaines*, *supra*, 46 Cal.4th at p. 180; *People v. Moreno* (2011) 192 Cal.App.4th 692, 703.)

If, after reviewing the personnel records, the trial court decides that nothing more need be disclosed to Nuno under *Brady* principles, it should state its reasons and reinstate its order denying Nuno's section 1172.6 petition. On the other hand, if the trial court determines that additional information must be disclosed to Nuno under *Brady* principles, the court should order disclosure, allow Nuno an opportunity to demonstrate prejudice, and order a new section 1172.6 evidentiary hearing if there is a reasonable probability the outcome would have been different had the information been disclosed. (*Gaines*, *supra*, 46 Cal.4th at p. 181; see also *id*. at p. 183 ["The reasonable-probability standard of prejudice we have applied in *Pitchess* cases is the same standard we have applied

---

[16] As noted *ante* (pt. I.C.1.), the limited information provided to Nuno regarding Officer Aguayo derived from a March 7, 2011 document in his personnel records. Thus, the source of the disclosed information was created after the preliminary hearing at which Aguayo testified (in September 2010) but before Nuno's no contest plea (in August 2011) and sentencing (in September 2011).

generally to claims that the prosecution improperly withheld exculpatory evidence in violation of a defendant's right to due process."].)

## III.  DISPOSITION

The July 13, 2023 order denying defendant Juan Nuno's Penal Code section 1172.6 petition is conditionally reversed, and the matter is remanded to the trial court with directions to conduct a new, in camera review of the personnel records of Officers Aguayo and Yanez consistent with this opinion.  If the court finds there is discoverable information that was not previously ordered disclosed, it shall determine whether Nuno was prejudiced by the denial of discovery.  If the court confirms the lack of any additional discoverable information or finds that Nuno was not prejudiced by any denial of discovery, the order denying Nuno's petition shall be reinstated.  In all other respects, the order is affirmed.

_____
                                    Danner, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P. J.




_____
Bromberg, J.




**H051205**
*People v. Nuno*

Trial Court:      County of Monterey

Trial Judge:      Honorable Rafael Vazquez

Counsel:          Eric Weaver, by appointment of the Court of Appeal under the Sixth
                  District Appellate Program, for Defendant and Appellant.

                  Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney
                  General, Jeffrey M. Laurence, Senior Assistant Attorney General,
                  Catherine A. Rivlin, Supervising Deputy Attorney General and Kevin
                  J. Lindsley, Deputy Attorney General, for Plaintiff and Respondent.

**H051205**
*People v. Nuno*